

**U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

**ENTERED**
TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

_____
Signed March 4, 2008                                           United States Bankruptcy Judge

_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| IN RE: | § § | |
| ROBERT WESLEY SHANNON AND JAN LARUE SHANNON, | § § § § | CASE NO. 06-44055-DML-7 |
| DEBTORS. | § § § | |
| BROOKE CREDIT CORPORATION, PLAINTIFF, | § § § § | |
| v. | § § § | ADVERSARY NO. 07-04020-DML |
| ROBERT WESLEY SHANNON, DEFENDANT. | § § § § | |
| IN RE: | § § | |
| ROBERT FRANKLIN SHANNON AND DARLA S. SHANNON, | § § § § § | CASE NO. 06-44448-RFN-7 |
| DEBTORS. | § | |

| | |
|---|---|
| BROOKE CREDIT CORPORATION,<br>PLAINTIFF,<br><br>v.<br><br>ROBERT FRANKLIN SHANNON AND<br>ROBERT WESLEY SHANNON,<br>DEFENDANTS. | §<br>§<br>§<br>§<br>§ ADVERSARY NO. 07-04025-RFN<br>§<br>§<br>§<br>§<br>§ |

## FINDINGS OF FACTS AND CONCLUSIONS OF LAW

1. Brooke Franchise Corporation ("Brooke Franchise") is a Delaware corporation headquartered in Overland Park, Kansas, that has established a franchising model under which third parties may purchase assets from Brooke Franchise to enable those third parties to own, operate and manage, as a franchisee of Brooke Franchise, insurance or financial services agencies or both. There are Brooke Franchise franchisees located across the country.

2. Brooke Franchise also purchases insurance agencies from sellers interested in selling an agency and the agency's customer lists and assets. Brooke Franchise will find potential buyers for the agency. Brooke Franchise will then purchase and sell the agency for the same price.

3. Additionally, Brooke Franchise, or one of its subsidiaries or affiliates, acts as agent of record for all insurance policies sold by any agent operating under the Brooke name. Accordingly, Brooke Franchise is the recipient of all sales commissions for such policies as the agent of record (the "Agent of Record").

4. Robert Frank Shannon ("Frank Shannon") is Robert Wesley Shannon's ("Wesley Shannon") father. Frank Shannon and Wesley Shannon are sometimes collectively referred to herein as the "Shannons."

5. Red Oak Financial Services, Inc. ("Red Oak") is, or was, a Brooke Franchise franchisee. Red Oak and the Shannons are in the business of selling, renewing, servicing and delivering insurance policies, including, but not limited to, property and casualty policies. The Shannons owned, and served as officers of, Red Oak.

6. Third parties who seek to purchase assets from Brooke Franchise often require financing for the purchase. Brooke Credit Corporation ("Brooke Credit") is an affiliate of Brooke Franchise, and it finances insurance agency purchases by franchisees. When Brooke Credit finances a purchase, Brooke Credit retains a security interest in the agency assets, including intangibles.

7. On or about March 5, 2001, Brooke Franchise and Red Oak entered into a Franchise Agreement (referred to herein, together with all addenda to the Franchise Agreement, as the "Franchise Agreement"). Pursuant to the Franchise Agreement, the Shannons agreed that Red

2

Oak would begin operating its insurance agency, which was located in Fort Worth, Texas, under the name of Brooke Insurance Services.

8. Under the Franchise Agreement, Brooke Franchise agreed to provide certain services and benefits to Red Oak, including accounting for and processing customer policies; permitting Red Oak to use Brooke Franchise's trade name and promotional materials; and providing Red Oak with access to Brooke Franchise's document management system.

9. In addition, the Franchise Agreement designated Brooke Franchise the Agent of Record for all customer accounts; granted Brooke Franchise, as a fee, 15% of all commissions; provided a term of five (5) years, which was renewable at expiration; and allowed Brooke Franchise to terminate the Franchise Agreement if Red Oak transferred customer accounts, relocated its agency office, or established an additional office, without prior written consent from Brooke Franchise.

10. In June of 2001, in order to build upon their existing business, the Shannons decided to also purchase an agency from Brooke Franchise that was located in Fort Worth, Texas. In connection with the purchase, Red Oak acquired certain assets from Brooke Franchise.

11. Red Oak obtained financing from Brooke Credit in the principal amount of $622,461.00 (the "Loan") in order to pay its obligations, including obligations incurred in connection with the purchase of the Fort Worth agency from Brooke Franchise.

12. Red Oak ultimately combined the assets of its original Fort Worth agency with those assets of the Fort Worth agency it purchased from Brooke Franchise. The two Fort Worth agencies are collectively referred to herein as the "Fort Worth Agency."

13. In connection with the Loan, Red Oak and Brooke Credit executed an agreement (the "Loan Agreement"), which provided for the initial advance of $622,461.00, as well as for the potential future advances. The Loan Agreement also prohibited the Shannons from soliciting customers or writing policies for a period of three (3) years after default or termination of the Loan Agreement, absent written consent. The Loan Agreement further required Red Oak to sign and deliver to Brooke Credit a security agreement, granting Brooke Credit a lien on Red Oak's personal property.

14. On or about June 30, 2001, Red Oak signed and delivered a security agreement (the "2001 Security Agreement"). Under the 2001 Security Agreement, Red Oak granted Brooke Credit a lien on, *inter alia*, all of its current and after-acquired equipment, customer accounts, customer lists, inventory, goods, instruments, documents, general intangibles, chattel paper, and investment property (collectively, the "Collateral"). By perfecting a security interest on Red Oak's customer accounts, Brooke Credit purported to have a security interest on future relations with Red Oak's customers.

15. In March of 2002, the Shannons decided to purchase a second insurance agency from Brooke Franchise located in Mineral Wells, Texas (the "Mineral Wells Agency").

3

16. In connection with the purchase of the Mineral Wells Agency, on or about March 31, 2002, Red Oak signed and delivered to Brooke Credit a promissory note in the original principal amount of $513,682.75.

17. On or about March 31, 2002, Red Oak signed and delivered to Brooke Credit a second security agreement (the "2002 Security Agreement," and together with the 2001 Security Agreement, the "Security Agreements") under which Red Oak granted to Brooke Credit an additional lien on the Collateral.

18. As a result of Red Oak's purchase of the Fort Worth Agency and Mineral Wells Agency from Brooke Franchise, the Franchise Agreement was amended to provide that it could not be terminated by Red Oak until Red Oak paid its debt owed to Brooke Credit.

19. On or about March 31, 2006, counsel for Red Oak and the Shannons wrote to Brooke Corporation, the parent company of Brooke Franchise and Brooke Credit, requesting that the debt owed by Red Oak to Brooke Credit, then in excess of $1.5 million, be reduced to approximately $473,000. Brooke Credit denied the request.

20. The Shannons sought advice from counsel as to their rights and responsibilities and were incorrectly advised that the Franchise Agreement had expired and they were free to enter into the insurance-agency business outside of the Franchise Agreement.

21. The Shannons, based on the clear provisions of the Security Agreements, were not justified in relying on the advice of such counsel.

22. On or about July 1, 2006, the Shannons, without advising Brooke Franchise or Brooke Credit, stopped operating as a Brooke Franchise franchisee or as Red Oak. Instead, the Shannons went to work for Texas American Insurers ("TIA"), a competing insurance agency.

23. In July of 2006, Frank Shannon began soliciting and diverting Red Oak customer accounts to TAI. He did this by calling, writing and visiting Red Oak's customers, asking them to move their accounts and business from Red Oak to TAI.

24. Wesley Shannon also contacted several former and current Red Oak customers to let them know the Shannons had moved to TAI.

25. The Shannons took office furniture and computers from Red Oak to use in their employment with TAI. The Shannons did not compensate Red Oak for any of these items or inform Brooke Credit of their actions. The Shannons, however, have offered to turn over some or all of the equipment that was owned by Red Oak to Brooke Credit.

26. On or after September 20, 2006, Brooke Credit first learned that the Shannons had stopped operating as a Brooke Franchise franchisee when the Shannons advised Brooke Franchise's employee, Todd Kilkenny, that they had moved the Fort Worth Agency and had decided to continue to sell insurance, but not as a franchisee of Brooke Credit.

4

27. On or about October 5, 2006, based on Red Oak's relocation of its agency operations, its establishment of an additional agency office, and its transfer of a portion of the Collateral, Brooke Franchise provided Red Oak with notice of termination of the Franchise Agreement.

28. On or about October 10, 2006, Brooke Credit wrote the Shannons and Red Oak to demand repayment of the Red Oak Loans and, among other things, to remind them of their solicitation obligations under the Loan Agreement. The Shannons received the October 10, 2006 letter sent by Brooke Credit.

29. On or about October 25, 2006, the Shannons conducted a mass mailing to 200-400 Red Oak customers, on Brooke letterhead, asking them to move their accounts to TAI.

30. Among other things, the letter said that the Shannons' "contract with Brooke Insurance has expired" and that they had "merged [their] agency with Texas American Insurers." In the letter, the Shannons asked the customers to appoint TAI as the customers' authorized Agent of Record "effective immediately." The letter provided contact information for the Shannons at TAI and also directed the customers to TAI's website.

31. On or about November 10, 2006, Brooke Credit made a demand for immediate delivery or return of the Collateral, including any of the Collateral delivered to TAI.

32. Neither TAI nor the Shannons paid anything to Brooke Credit or Red Oak for Red Oak's Collateral transferred to TAI.

33. Transfer from Red Oak of the Collateral substantially reduced the value of Red Oak such that it could not satisfy its debt to, *inter alia*, Brooke Credit.

34. On or about November 14, 2006, Brooke Credit filed a lawsuit in Kansas state court against Red Oak, the Shannons and TAI, seeking to recover amounts due and to prevent the Shannons from further soliciting Red Oak customers.

35. On or about November 16, 2006, the Kansas state court entered a temporary restraining order, directing the Shannons to cease all efforts to solicit Red Oak customers.

36. Even after entry of the temporary restraining order, the Shannons continued to contact and solicit Red Oak customers.

37. TAI later removed the Kansas state court litigation to federal court and Brooke Credit then obtained a preliminary injunction in federal court against TAI, directing TAI and its employees to cease solicitation of Red Oak customers.

38. On or about November 13, 2006, Red Oak filed a chapter 7 proceeding in the U.S. Bankruptcy Court for the Northern District of Texas, Case No. 06-44054.

39. On or about November 13, 2006, Wesley and Jan Shannon filed a voluntary chapter 7 proceeding in the U.S. Bankruptcy Court for the Northern District of Texas, Case No. 06-44055.

40. On or about December 8, 2006, Frank and Darla Shannon also filed a voluntary chapter 7 proceeding in the U.S. Bankruptcy Court for the Northern District of Texas, Case No. 06-44448.

41. Brooke Credit filed a proof of claim in the amount of $1,244,186.10 in the Red Oak bankruptcy case.

42. Brooke Credit filed proofs of claim in the amount of $1,244,186.00 in the Wes and Jan Shannon bankruptcy case and the Frank and Darla Shannon bankruptcy case.

## **CONCLUSIONS OF LAW**

1. Brooke Credit is a creditor of Red Oak.

2. Red Oak is an insider of the Shannons and a debtor in another case.

3. Diversion of Red Oak's customers constitutes a diversion of property of the estate in Red Oak's chapter 7 case.

4. The court need not address whether Brooke Credit's security interest attached such that it had the exclusive right to solicit customers because the diversion of customers substantially reduced the value of Red Oak.

5. By diverting assets from Red Oak, the Shannons made Red Oak unable to pay its debts, including that owed to Brooke Credit, causing Brooke Credit harm. *See In re Watman*, 458 F.3d 26 (1st Cir. 2006).

6. The Shannons knew that diversion of Red Oak's customers would leave Red Oak unable to satisfy the claims against it.

7. Accordingly, the Shannons' debt is nondischargeable in accordance with Bankruptcy Code § 727(a)(2) and (a)(7).

8. Brooke Credit has not proven by a preponderance of the evidence that the Shannons have failed to account for loss of the collateral. Therefore, the court will not deny the Shannons' right to a discharge pursuant to Bankruptcy Code § 727(a)(5) and (a)(7).

9. Brooke Credit has failed to prove by a preponderance of the evidence that the Shannons had (within the meaning of Code § 523(a)(4)) or breached any fiduciary duty to Brooke Credit, that the transfers orchestrated by the Shannons of Collateral occurred as a result of intentional deceit or that the Shannons' inability to account for funds to Brooke Credit involved reckless behavior or willful neglect. Therefore, the debt to Brooke Credit is not nondischargeable pursuant to Code § 523(a)(4).

10. Brooke Credit has failed to prove by preponderance of the evidence that the Shannons acted maliciously within the meaning of Code § 523(a)(6) in transferring the Collateral.

6

Therefore, the debt to Brooke Credit is not nondischargeable pursuant to Code § 523(a)(6).

###END OF ORDER###